May it please the Court, my name is Dave Chipman. I had the pleasure of representing Linabel Mejia-Ramos. This is an appeal from the BIA with the underlying appeal coming from an immigration court. Linabel is a native of Honduras, has made claims for asylum and also withholding of removal. She fled to the United States in early 2014, late 2013 and entered the United States. She claimed asylum and eventually there was a hearing held in 2017 regarding her asylum claim and also her withholding removal claim. What we're saying in our appeal is that the underlying decision by the BIA and the immigration judge, and the BIA in this case parroted the findings of the immigration judge. What we're arguing is that the court erred in its findings of fact. The court, their findings of fact will be upheld if they're found based upon substantial evidence. That's the standard. To reverse, you know, for this court to reverse BIA findings, you must find that the evidence not only supports a contrary conclusion but compels it. And so there's three main areas here, you know, where the BIA slash immigration judge found that our client failed to meet her burden of proof. And so she has a burden of persuasion in this case. And she has to show that she has a well-founded fear of returning to her native country, Honduras. One is that they said that there was an insufficient level of harm. In this case, Linabel's father in 2008, they owned a little carpentry shop in Honduras. They also owned a coffee plantation. Honduras, by the country reports, is a extremely poor country. They were probably considered middle class by the standards in Honduras. And her father and brother were kidnapped. And then shortly thereafter, there was a call. And they called the mother, and all the family lived together, and they said, you know, we want a ransom. There was never any, you know, anything done on that ransom. But the father and brother were never heard from again. And I think one of the important points that was missed by the court is, first of all, I think it's important for this court to realize a very important fact, finding a fact in any case with immigration is a finding of credibility.  The immigration judge found Linabel to be credible. And so what Linabel testified to, and it's also important, I believe, that the case also says that testimony alone can establish your asylum claim. The Eighth Circuit has said that as well, is that the people who kidnapped her father and brother were the DCIG. And the DCIG is an arm of the Honduran police. And one of the things that the judge did was he kept trying to push it into a gang-related, you know, he just assumed that it was a gang-related crime. You know, obviously gangs are rampant in Honduras. However, that's never where Linabel ever steered in her testimony. In fact, she just said the DCIG, they appeared as if they were part of the Honduran government. And then there's also other evidence that's cited in the immigration judge's order, where he cites to a country report, where the country report says there is widespread, widespread corruption within the Honduran police. And so after her father and brother were kidnapped and never heard from again, then someone attempts to kidnap Linabel and her cousin while they're traveling on the road. So they're targeted again. They escape narrowly. They go to the police. The police are hesitant to take any investigation whatsoever. That police report is actually in the record as well, which I think is important. So she's substantiating her claims. And it took a long time for the police to even take a report. They did nothing about it. And then when they continued to try to find out where the father and brother were, one of the people that was helping them, Mr. Zuniga, was kidnapped as well while he was at her father's old carpentry shop. So the family lives in constant fear. They are basically hermits in their own home or community. And then five years later, living with this fear, Linabel gets a call, and the caller says basically the same thing that's going to happen to your brother and father is going to happen to you, which is kidnapping and ultimately obviously death because no one's ever heard from the brother or the father again. And so one of the things that they found, that IJ found, the immigration judge found, was that it was an insufficient level of harm. And they focused a lot on whether she was physically harmed in Honduras. And one of the things you can have in an asylum claim is a threat. And one of the things that the government cites in their brief is an unfulfilled threat is insufficient. But there's a case in L.A. that I cite in my brief out of the Seventh Circuit. And in that case, it deals with basically a threat going through someone who was kidnapped themselves to the ultimate person where they found that to be a credible threat sufficient to show persecution. And in this case, she knows that her father and brother have been kidnapped, and now they're threatening her with the same thing, which is ultimately a death threat. And so she immediately flees. She flees the country. So I think it was an error for this court, for the BIA and the immigration judge, to find that there was not at least past persecution as far as a credible threat to Linabel, given the fact that her father and brother were kidnapped and ultimately obviously killed. Another thing that the immigration judge and BIA found was that the persecutors were not state actors. And that was just an assumption that these people who kidnapped her father were not with the Honduran police. But that really wasn't based on the record as a whole. I mean, they were cloaked with the garb of the Honduran police, and they actually took them. So I think that was just pure speculation by the immigration judge to find that there was not a state actor, particularly given the fact that he cites to a brief or to a country condition report that says there's high corruption within these Honduran police. And then the other factor is that you have to have a protected ground. So, you know, you're being persecuted based upon, you know, many different things like political opinion, but also membership in a particular social group. In this case, she is saying that it's because she's part of the Mija Ramos family. And so every circuit has found that a nuclear family is a sufficient basis for the finding of a particular social group for purposes of persecution. But what's the evidence here that they targeted her because of her membership in the family, as opposed to wealth or some factor that wouldn't apply? So I think what the judge basically- That would apply independent of family status. Right. I understand. So one of the things I think that's kind of frustrating, Your Honor, is that they just assume you're wealthy, and therefore, just because you're wealthy, we're not going to find that's a particular social group. But there's a case out of the First Circuit. It's Olodana Ramos versus Holder. And that's a case I cited in the brief as well. But they talk about the fact that, you know, this family is, you know, wealthy or they're, you know, middle class. And that's part of the- It's an immutable distinction of that family. So that is one of the reasons why- That's one of the characteristics of this family. It's not just purely because they're wealthy. I think wealth is immutable, but it may be a characteristic of the family. I don't know what you mean by immutable. I mean, so basically, like, the family is known in the community for having money, you know, or for having- for being, you know, at least middle class. And so that is one of the characteristics of the family. But the family continues to be targeted over and over again, even as their holdings dwindle. For instance, so what I'm saying is it's not just purely based on wealth. That may be a factor of why they are being targeted, but that is not the sole factor. It's this factor that they continue to persecute them by their identity, you know. And so they kidnap the father and brother. They try to kidnap the cousin and Linabel. And then they, you know, threaten Linabel at the very end, even after the family's holdings have greatly dwindled. So what I'm saying is that I think it's kind of a- it's just easy to kind of write it off saying that it's just purely wealth, but, you know, under that standard, you could almost never then find for a finding that a particular social group is a family. And so I think it's more than just wealth, Your Honor, is what I'm trying to say. All right. I'm- Thank you for your- yeah, your time has expired. We appreciate your argument, Mr. Chipman. And we'll hear from Ms. Cain for the respondent. Very well. Thank you, Your Honors. And may it please the court, Kylie Cain on behalf of the Attorney General. Your Honor, there are two dispositive findings made by the agency in this case. And both of them serve as justification to deny this petition for review. The first is the finding that the harm that Ms. Mejia-Ramos suffered in the past didn't rise to the level of persecution under the Immigration and Nationality Act. That finding is coupled with the finding that she also didn't show an objective fear of return if she were to return to Honduras. Those two things together serve as the first dispositive basis upon which the court could deny the petition for review. Separate and apart from that is the nexus finding, which you were discussing with Mr. Chipman a moment ago, which is that the agency found that she did not establish through sufficient evidence that she was being targeted because of her relationship to the Mejia-Ramos family. The issues surrounding things like immutability or whether a family group can constitute a particular social group were not actually at issue in this case. It's purely a nexus finding. The Supreme Court in Elias Zacharias in 1992 explained what that nexus finding is. And the court was articulating that the Immigration and Nationality Act makes motive critical in asylum cases and that the petitioner who's seeking, the applicant who's seeking asylum, needs to provide some evidence, whether direct or circumstantial, of that motive. That is where Ms. Mejia-Ramos failed here. It is true that she was related to people who were also kidnapped, her father and her brother. But what is missing from the evidentiary record here, at least according to the agency, is some indication that the people who called her, the person who called her on her cell phone five years after her family had been kidnapped, cared to persecute her because of her status as a member in the Mejia-Ramos family as opposed to to kidnap her for ransom, which is what happened to her father and brother. If she were targeted because they want money from her, that is not a protected ground under the Immigration and Nationality Act. And that is what the agency found, was that this was driven by wealth. The agency was not speculating when it found that. It found that based on Ms. Mejia-Ramos' own testimony, where she explained the circumstances regarding the 2008 kidnapping, where the callers called back to the house, they asked for the mother, they demanded a ransom, they gave a particular amount of money that they wanted. Unfortunately, nothing came of that in terms of being able to pay the ransom and get the family members back. The people who kidnapped the father and brother in 2008 just simply never contacted the family again that we can tell. The 2013 phone call, we don't know if it was connected to that original 2008 kidnapping. It very well could have been. It could have been the same people. Could be a copycat. Could be just other criminals who were seeking to continue to target the family because of wealth. We don't really know. Because Ms. Mejia-Ramos didn't testify about that incident in any more detail than to say that she received a phone call on her cell phone in 2013. And that the persecutor, or the would-be persecutor on the phone, said the same thing that happened to your dad and your brother is going to happen to you, full stop. So when looking at what the motivation of why that phone call took place, we just simply don't know. We know that they are referencing the family, that there had been a kidnapping in the past, but we don't know what they want or why they're calling her. Because actually, in that incident, they didn't elicit money. The threat was just the same thing that's going to happen to them, or the same thing that happened to them is going to happen to you. It wasn't a traditional threat, you know, if you don't do this, we will do this. So we simply just have an evidentiary gap where we don't know why that phone call took place. We don't know what the people want or what animated their desire to call her, particularly five years after the incident in 2008 regarding her father and her brother. Ms. Mejia-Ramos is advocating that the record compels this court to conclude that that phone call was somehow based on wanting to overcome her status as a member of the Mejia-Ramos family. And I'm not saying that that inference couldn't have been drawn below, but it's certainly not compelled. The immigration judge was not forced to find that inference. The inference that he drew was that we just simply don't know the motive following that 2013 phone call. We don't know why they called. They didn't say why, and they didn't say what they wanted. And therefore, she's not established the requisite nexus in order to make a claim based on her social group, which she defined as the Mejia-Ramos family. As I mentioned at the outset, however, that is just one way to deny the petition for review in this case. The other way is to go to affirm the agency's finding that what happened to her in the past, meaning that phone call didn't sufficiently rise to the level to constitute past persecution under the Immigration and Nationality Act. And that finding is also supported by substantial evidence. This court has multiple precedential decisions discussing what happens when unfulfilled threats are directed at people in their home countries. I think the Seti Adi decision cited in Respondent's brief is particularly informative on this point. In that case, it was a Catholic gentleman who lived in Indonesia, which is predominantly Muslim. In that case, he married a Muslim woman, and the woman's brother threatened petitioner because of the interfaith marriage. And the brother had hit his own sister. There was physical violence against the sister. It then threatened the petitioner and said, I'm going to kill you because you've married my sister. So there was violence that predated the threat. Then the threat happened. And even in that instance where there was some indication that the person, the perpetrator, would be willing to effectuate violence against a person, this court held that that was essentially a personal dispute and that the harm, the death threat itself, did not constitute past persecution sufficient to give rise to the rebuttable presumption of a well-founded fear of future persecution. I submit it's the same situation here. What's really going on in this case is crime. Her brother, her father, unfortunately, suffered a kidnapping for ransom. Terrible situation. But at the end of the day, that's a crime. It's not something that will establish eligibility for asylum. I'd be happy to yield the rest of my time back to the court unless you have any questions for me. Very well. Thank you for your argument. Appreciate it. Thank you. We'll yield one of your minutes to Mr. Chipman for rebuttal. Your Honor, one of the things that the government stated was dealing with the family that, you know, citing the case dealing with a personal dispute, this is not a personal dispute and it's not just crime. It's the fact that her family is being targeted. I mean, I think that's got to be unequivocal. Her brother and father are kidnapped. Her cousin and her are, they attempt to kidnap them, and then they come right back with the knowledge of what happened to her father and brother and threaten her. And this threat is so severe that she flees the country. And one of the things is the immigration judge did find subjectively that Elena Bell is fearful of her life. And so what the court said was, the board said, was that objectively they didn't find it to rise to that level. But I think that's an error because I think anyone in her circumstance, you know, after what happened to her brother and father would do the exact same thing, would try to immediately leave. So with that, I submit, Your Honor. Very well. Thank you. Thank you for your argument. The case is submitted and the court will file an opinion in due course. Counsel are excused.